UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| J.C.L.A.,<br><br>   Petitioner,<br><br>   v.<br><br>MINGA WOFFORD, Mesa Verde ICE Processing Center Facility Administrator; SERGIO ALBARRAN, Acting Field Office Director of the San Francisco Immigration and Customs Enforcement Office; TODD M. LYONS, Acting Director of United States Immigration and Customs Enforcement; KRISTI NOEM, Secretary of the United States Department of Homeland Security; PAMELA BONDI, Attorney General of the United States,<br><br>   Respondents. | No.  1:25-cv-01310-KES-EPG (HC)<br><br>ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION<br><br>Doc. 2 |

Petitioner J.C.L.A. is an asylum-seeker from Colombia who entered the United States in August 2024. After entry, he was briefly detained by immigration officials but then released pending his removal proceedings after the officials determined that he was neither a danger nor a flight risk. Since then, he has lived with his wife and two young children in San Francisco, gained lawful employment, sought relief in his immigration case, and maintained a clean criminal record. On September 15, 2025, Immigration and Customs Enforcement ("ICE") agents re-detained petitioner when he appeared for a scheduled check-in.

1

1  On October 5, 2025, petitioner filed a petition for writ of habeas corpus, Doc. 1, and a motion for a temporary restraining order, in which he seeks his immediate release from detention and an injunction prohibiting the government from re-detaining him unless it first provides him with a hearing before a neutral adjudicator, Doc. 2.[1]  Respondents filed an opposition on October 10, 2024, Doc. 12, and petitioner filed a reply on October 14, 2025, Doc. 13.[2]

The Court held a hearing on October 16, 2025.  At the hearing, the Court raised with the parties whether petitioner's motion should be converted into a motion for preliminary injunction because the standard is the same and respondents had notice and opportunity to respond through a written opposition and through oral argument at the hearing.  *See* Docs. 12, 13.  The parties agreed that the motion should be converted to one for a preliminary injunction.  As the parties agree that the motion is ripe for conversion and do not believe that additional briefing is needed, petitioner's motion is converted to a motion for preliminary injunction.  For the reasons set forth below, petitioner's motion for a preliminary injunction is granted.

I.  **Background**[3]

Petitioner fled Colombia because he and his family received death threats.  *See* Doc. 1 at ¶¶ 11, 58; Doc. 1-3, Ex. 1.  On August 27, 2024, he crossed the southern border and was detained by U.S. immigration officials for about twenty-four hours.  Doc. 1 at ¶ 6; Doc. 12-2, Ex. 2.  The immigration officials issued a notice to appear for removal proceedings to petitioner.  Doc. 1 at

---

[1] Petitioner also filed a motion to proceed under pseudonym, which was granted by separate order.

[2] Respondents confirmed at the hearing that their opposition brief, Doc. 13, would also serve as their response to petitioner's habeas petition.  Additionally, in their opposition, respondents request that the Court "strike and [] dismiss all unlawfully named officials under § 2241." Doc. 12 at 1, n.1.  Respondents' request is procedurally improper because a "request for court order must be made by motion." *Ortega v. Kaiser*, No. 25-CV-05259-JST, 2025 WL 2243616, at *4 (N.D. Cal. Aug. 6, 2025).  "[A] request for affirmative relief is not proper when raised for the first time in an opposition." *Id.*  As such, respondents' request is denied without prejudice.

[3] Some of the facts articulated in this section come from petitioner's verified petition.  A court "may treat the allegations of a verified . . . petition [for writ of habeas corpus] as an affidavit." *L. v. Lamarque*, 351 F.3d 919, 924 (9th Cir. 2003) (citing *McElyea v. Babbitt,* 833 F.2d 196, 197–98 (9th Cir. 1987)).

2

¶ 54; Doc. 12-1, Jerome Decl. at ¶ 8.  The immigration officials then decided that petitioner would be released on his own recognizance pending those removal proceedings, and they released him with a GPS monitoring device and instructions to report to the San Francisco ICE office.  Doc. 1 at ¶ 7; Doc. 12-1, Jerome Decl. at ¶ 9; Doc. 12-2, Ex. 3.  The order releasing petitioner on his own recognizance stated that he was being released "[i]n accordance with section 236 of the Immigration and Nationality Act [8 U.S.C. § 1226]" and applicable C.F.R. provisions.  The regulations that authorize immigration authorities to release a noncitizen on his own recognizance require that the noncitizen "demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons" and that the noncitizen is "likely to appear for any future proceeding."  8 C.F.R. § 1236.1(c)(8).  "Release [therefore] reflects a determination by the government that the noncitizen is not a danger to the community or a flight risk."  *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1176 (N.D. Cal. 2017), *aff'd sub nom. Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018).

      As instructed, petitioner reported to the ICE office in San Francisco on September 30, 2024.  Doc. 1 at ¶ 55.  During his appointment at the ICE office, ICE instructed him to report to the Intensive Supervision Appearance Program ("ISAP") office in San Francisco.  *Id.*  Petitioner complied, and when he arrived there, he was placed in the ISAP program.  *Id.*  ISAP officers removed the GPS monitoring device, installed an application on his phone for telephonic reporting, and instructed petitioner to return for another in-person appointment in three months.  *Id.* ¶ 8.  Three months later, petitioner attended that appointment, and the ISAP officers determined that he would be required to virtually present himself every three months and take a photo of himself once a month at a random time from that point forward.  *Id.*  Although petitioner appeared for all in-person check-ins as required, *see id.* ¶¶ 28, 32, he submitted the photo of himself late on December 23, 2024, and on August 4, 2025, *id.* ¶ 9; Doc. 12-1, Jerome Decl. at ¶¶ 10–11.  Petitioner asserts that he submitted those photos late because he worked night shifts and was asleep when the random notification appeared.  Doc. 1 at ¶ 9.  Petitioner informed his ISAP officer of the reason for the delay in submitting the photo, and petitioner asserts that the ISAP officer assured him that this was not an issue.  *Id.*

While in the United States, petitioner has lived with his wife and two young children in San Franciso, California. *Id.* ¶ 10. He obtained a valid work authorization and worked night shifts at a supermarket to support his family. *Id.*; *see* Doc. 1-3, Ex. 1. He sought relief in his removal proceedings by filing an application for asylum and withholding of removal, and his first hearing in immigration court was set for August 2026. Doc. 1 at ¶ 11.

On September 14, 2025, an ICE agent instructed petitioner to appear at the ISAP office the next day. *Id.* ¶ 12. When he appeared at the ISAP office, ISAP officers told petitioner to report to the ICE office instead. *Id.* ¶ 13. When he reported to the ICE office, ICE agents arrested him. *Id.* ¶¶ 14–16. The ICE agents told petitioner that he was being detained for failure to comply with the ISAP requirements. *Id.* ¶ 15. The agents then handcuffed petitioner, and he was held in a small holding room at the ICE office overnight. *Id.* ¶¶ 15, 18. Petitioner indicates that he was held in extremely uncomfortable and unsanitary conditions. *Id.* ¶¶ 18–22. The next day, ICE agents transported him to Mesa Verde ICE Processing Center, a detention facility in Bakersfield, California. *Id.* ¶ 22. Petitioner indicates he was then held overnight in an overcrowded holding cell in which there was no room to lie down, before being assigned to a cell the following day. *Id.* ¶¶ 22–26.

## II.     Legal Standard

The standards for issuing a temporary restraining order and a preliminary injunction are "substantially identical." *See Stuhlbarg Int'l Sales Co. v. John D. Bush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20 (citing *Munaf*, 553 U.S. at 689–90; *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542 (1987); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311–12 (1982)). "Likelihood of success on the merits is a threshold inquiry and is the most important factor." *Simon v. City & Cnty. of San Francisco*, 135 F.4th 784, 797 (9th Cir. 2025) (quoting

1  *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020)). "[I]f a plaintiff can only show that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are satisfied." *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014) (internal quotation marks and citations omitted).

### III. Discussion

#### a. Petitioner is Likely to Succeed on the Merits.

Because civil immigration detention is typically justified only when a noncitizen presents a risk of flight or danger to the community, *see Zadvydas v. Davis*, 533 U.S. 678, 690 (2001); *Padilla v. ICE*, 704 F. Supp. 3d 1163, 1172 (W.D. Wash. 2023), petitioner argues that the Due Process Clause bars the government from re-detaining him without first providing a hearing where it must prove he is a flight risk or danger. Doc. 2 at 13–23. Petitioner's Due Process claim is analyzed "in two steps: the first asks whether there exists a protected liberty interest under the Due Process Clause, and the second examines the procedures necessary to ensure any deprivation of that protected liberty interest accords with the Constitution." *Garcia v. Andrews*, No. 2:25-cv-01884-TLN-SCR, 2025 WL 1927596, at *2 (E.D. Cal. July 14, 2025) (citing *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460 (1989)).

#### 1. Petitioner Possesses a Protected Liberty Interest.

A protected liberty interest may arise from a conditional release from physical restraint. *Young v. Harper*, 520 U.S. 143, 147–49 (1997). Even when a statute allows the government to arrest and detain an individual, a protected liberty interest under the Due Process Clause may entitle the individual to procedural protections not found in the statute. *See id.* (Due Process requires pre-deprivation hearing before revocation of preparole); *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973) (same, in probation context); *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972) (same, in parole context). To determine whether a specific conditional release rises to the level of a protected liberty interest, "[c]ourts have resolved the issue by comparing the specific conditional release in the case before them with the liberty interest in parole as characterized by

5

*Morrissey.*" *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 887 (1st Cir. 2010) (internal quotation marks and citation omitted).

In *Morrissey*, the Supreme Court explained that parole "enables [the parolee] to do a wide range of things open to persons" who have never been in custody or convicted of any crime, including to live at home, work, and "be with family and friends and to form the other enduring attachments of normal life." *Morrissey*, 408 U.S. at 482. "Though the [government] properly subjects [the parolee] to many restrictions not applicable to other citizens," such as monitoring and seeking authorization to work and travel, his "condition is very different from that of confinement in a prison." *Id.* "The parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions." *Id.* The revocation of parole undoubtedly "inflicts a grievous loss on the parolee." *Id.* (quotations omitted). Therefore, a parolee possesses a protected interest in his "continued liberty." *Id.* at 481–84.

Petitioner's release on his own recognizance pending his removal proceedings is similar. Among other things, it allowed him to live with his wife and two young children in San Francisco. Petitioner obtained a valid work authorization, supported his family by working night shifts at a local supermarket, and sought relief in his removal proceedings.

Respondents argue that petitioner does not have a liberty interest because 8 U.S.C. § 1225(b) mandates that he be detained. Doc. 12 at 7–12 (citing *DHS v. Thuraissigiam*, 591 U.S. 103, 139–40 (2020), and *Landon v. Plasencia*, 459 U.S. 21, 32 (1982)). This argument is unpersuasive because the record shows that the government treated petitioner as subject 8 U.S.C. § 1226(a), not § 1225(b), when it released him in 2024. Doc. 12-2, Ex. 3. The immigration officials who released petitioner issued an order of release on recognizance which stated that petitioner was being released "[i]n accordance with section [1226]."[4] *Id.*

Respondents contend that the immigration officials' release of petitioner pursuant to § 1226(a) was based on the government's prior incorrect interpretation of that statute, and the

---

[4] Other courts have also found, in similar circumstances, that once the government "elect[s] to proceed . . . under § 1226, [it] cannot [] reverse course and institute § 1225 . . . proceedings." *Ramirez Clavijo v. Kaiser*, No. 25-CV-06248-BLF, 2025 WL 2419263, at *4 (N.D. Cal. Aug. 21, 2025).

6

government has since determined that § 1225(b) applies. Doc. 12 at 5. Even if the government were correct that § 1225(b), by its terms, could apply to petitioner, the government previously represented to petitioner, in the order of release on recognizance, that he had been "released on [his] own recognizance [under § 1226(a)] provided that he comply with" certain conditions.[5] Doc. 3-4, Ex. A at 2. This was an "implicit promise" that his release would "be revoked only if he fail[ed] to live up to the [release] conditions," as in *Morrissey*. *Morrissey*, 408 U.S. at 482. As other courts have held, "[w]hen a person [is released from custody and] lives in society at large for years, [reasonably believed that the law required his release], and only then faces re-incarceration on the ground that he was [erroneously] released, the prospect of re-incarceration has implications both for him and the other individuals in his life as substantial as those of the parolee in *Morrissey*." *Hurd v. Dist. of Columbia, Gov't*, 864 F.3d 671, 682 (D.C. Cir. 2017). Thus, the argument that "a mistakenly released [person] does not have a legitimate claim of entitlement to freedom [under the Due Process Clause] . . . cannot be squared with established law." *Id.* at 682. Even if § 1225(b)(1) *did* apply, petitioner has a protected liberty interest based on the government's prior representation to him in the order of release on recognizance that his release was pursuant to § 1226.

Perhaps in recognition of this, respondents point out that the order of release on recognizance states that petitioner's release was "contingent upon [his] . . . successful participation in the [ISAP] program," Doc. 12-2, Ex. 3, and petitioner "violated the terms of his participation in the [ISAP] program by completing [two] ISAP check-in[s] late," Doc. 12-1, Jerome Decl. at ¶¶ 10–11. But the document also states that petitioner's release was "in accordance with section [1226]." Doc. 12-2, Ex. 3. Pursuant to § 1226, petitioner would be entitled to a bond hearing, and any custody redetermination would have to be based on whether petitioner is "a threat to national security, a danger to the community at large, likely to abscond, or otherwise a poor bail risk." *In re Guerra*, 24 I. & N. Dec. 37, 40 (BIA 2006).

---

[5] The Court has previously rejected the statutory arguments that respondents make here. *See Guerrero Lepe v. Andrews*, No. 1:25-CV-01163-KES-SKO (HC), 2025 WL 2716910, at *1 (E.D. Cal. Sept. 23, 2025).

1    Respondents do not argue that petitioner's two late check-ins mean that he is a flight risk
2 or danger to the community.[6] *See* Doc. 12. Rather, respondents assert that ICE arrested
3 petitioner for those two technical violations. Doc. 12-1, Jerome Decl. at ¶ 12; Doc. 12-2, Ex. 5.
4 Other courts have rejected the argument that "ICE [can] re-detain those released for purely
5 technical violations, like being [] late to a check-in," without regard to whether that technical
6 violation means that one is a flight risk or danger. *Guillermo M. R. v. Kaiser*, No. 25-CV-05436-
7 RFL, 2025 WL 1983677, at *8 (N.D. Cal. July 17, 2025); *see Espinoza v. Kaiser*, No. 1:25-CV-
8 01101 JLT SKO, 2025 WL 2581185, at *12–14 (E.D. Cal. Sept. 5, 2025) (finding that petitioner
9 who was redetained after missing a check-in completely and failing to update ICE with a change
10 of address had protected liberty interest which required post-deprivation bond hearing). Under
11 § 1226(a), which was the statute the government cited as the basis for petitioner's release on his
12 own recognizance in August 2024, petitioner was entitled to have a custody redetermination
13 based on whether he was a flight risk or danger. *In re Guerra*, 24 I. & N. Dec. 37, 40 (BIA
14 2006). Given the time he spent at liberty following his initial release from detention upon a
15 determination that he was not a flight risk or danger, as well as the government's implicit promise
16 that any custody redetermination would be based on those same criteria, petitioner has a protected
17 "interest in remaining at liberty unless [he] no longer meets those criteria." *Espinoza v. Kaiser*,
18 No. 1:25-CV-01101 JLT SKO, 2025 WL 2581185, at *13 (E.D. Cal. Sept. 5, 2025) (quoting
19 *Pinchi v. Noem*, No. 5:25-CV-05632-PCP, 2025 WL 2084921, at *4 (N.D. Cal. July 24, 2025)).[7]
20 If respondents believe that petitioner's two late check-ins mean that he is a flight risk, they can

---

[6] The government does not dispute petitioner's representation that he showed up for every in-person check-in. Doc. 1 at ¶¶ 28, 32. In fact, petitioner was arrested at an in-person check-in, which was the second in-person check-in that he had attended following his late virtual check-in on August 4, 2025. *Id.* ¶¶ 12–16.

[7] Respondents also argue that petitioner was released in 2024 only due to a lack of bed space at the detention facility and that if the immigration authorities "had sufficient detention space for Petitioner, there would be no dispute that [they] could detain him pending the outcome of his removal proceedings." Doc. 12 at 6. That argument is unpersuasive. The fact is that the immigration authorities *did* release petitioner after determining that he was not a flight risk or danger, and he subsequently spent over a year out of custody. His liberty interest arises from those circumstances.

make that argument at any future bond hearing.

Respondents next argue, citing *Thuraissigiam* and *Landon*, that petitioner has no Due Process rights and that his rights are limited to those provided by statute. Doc. 12 at 11–12 (citing *DHS v. Thuraissigiam*, 591 U.S. 103, 139–40 (2020), and *Landon v. Plasencia*, 459 U.S. 21, 32 (1982)). This argument is unpersuasive for two reasons. First, it fails to appreciate the distinction between persons already located inside the United States, like petitioner, and persons attempting to enter the United States, like the petitioners in *Thuraissigiam* and *Landon*. "It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (citing *United States v. Verdugo–Urquidez,* 494 U.S. 259, 269 (1990); *Johnson v. Eisentrager,* 339 U.S. 763, 784 (1950)). "But once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Id.*; *see Hernandez v. Sessions*, 872 F.3d 976, 990 (9th Cir. 2017) ("[I]t is well-established that the Due Process Clause stands as a significant constraint on the manner in which the political branches may exercise their plenary authority.").

Second, respondents' argument misconstrues the nature of the challenge that petitioner brings in this case, which is a challenge to his detention. *Thuraissigiam* held that a petitioner who was stopped at the border did not have any due process rights *regarding admission into* the United States. *Thuraissigiam*, 591 U.S. at 107; *see also Landon*, 459 U.S. at 32 ("("[A]n alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application . . . ."). However, petitioner challenges his re-detention without a hearing; he does not challenge in this habeas action any determination regarding his admissibility. *See Padilla v. ICE*, 704 F. Supp. 3d 1163, 1170–72 (W.D. Wash. 2023) (discussing *Thuraissigiam* and explaining the distinction between a challenge to admission and a challenge to detention); *Hernandez*, 872 F.3d at 981 ("[T]he government's discretion to [detain] non-citizens is always constrained by the requirements of due process.").

"Although the Supreme Court has described Congress's power over the 'policies and rules

9

for exclusion of aliens' as 'plenary,' and held that this court must generally 'defer to Executive and Legislative Branch decisionmaking in that area,' it is well-established that the Due Process Clause stands as a significant constraint on the manner in which the political branches may exercise their plenary authority"—through detention or otherwise. *Hernandez*, 872 F.3d at 990 n.17 (citing *Kleindienst*, 408 U.S. at 769; *Zadvydas*, 533 U.S. at 695). The Due Process Clause protects petitioner, a person inside the United States, from unlawful detention. *See Zadvydas*, 533 U.S. at 693.

The Court finds that petitioner has a protected liberty interest in his release. *See Guillermo M. R. v. Kaiser*, No. 25-CV-05436-RFL, 2025 WL 1983677, at *4 (N.D. Cal. July 17, 2025) (recognizing that "the liberty interest that arises upon release [from immigration detention] is *inherent* in the Due Process Clause"); *Ortega v. Kaiser*, No. 25-cv-05259-JST, 2025 WL 1771438, at *3 (N.D. Cal. June 26, 2025) (collecting cases finding that noncitizens who have been released have a strong liberty interest). The Court must therefore determine what process is due before the government may terminate his liberty.

## 2. A Pre-Deprivation Bond Hearing Is Required.

Due process "is a flexible concept that varies with the particular situation." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990). The procedural protections required in a given situation are evaluated using the *Mathews v. Eldridge* factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)); *see Hernandez v. Sessions*, 872 F.3d 976, 993 (9th Cir. 2017) (applying *Mathews* factors in immigration detention context).[8]

---

[8] Respondents argue that the Supreme Court has never utilized the *Mathews* factors in evaluating a Due Process claim by a noncitizen, Doc. 12 at 7 (citing *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1206 (9th Cir. 2022)), but the government analyzes petitioner's situation under the *Mathews* factors without proposing an alternative test. Courts in this circuit regularly employ the *Mathews* factors to evaluate the Due Process argument that petitioner makes here. *See e.g.*,

10

Turning to the first factor, petitioner has a significant private interest in remaining free from detention. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Petitioner had been out of custody for over a year, and during that time, he obtained a work authorization and he lived with and cared for his family, including his two minor children. His detention denies him that freedom.

Second, "the risk of an erroneous deprivation [of liberty] is high" where, as here, "[the petitioner] has not received any bond or custody redetermination hearing." *A.E. v. Andrews*, No. 1:25-cv-00107-KES-SKO, 2025 WL 1424382, at *5 (E.D. Cal. May 16, 2025). Civil immigration detention, which is "nonpunitive in purpose and effect[,]" is justified when a noncitizen presents a risk of flight or danger to the community. *See Zadvydas*, 533 U.S. at 690; *Padilla*, 704 F. Supp. 3d at 1172. Petitioner indicates that he has no criminal history and has attended every in-person check-in since he arrived in the United States. *See* Doc. 1 at ¶¶ 10, 28–32.

Given the absence of any procedural safeguards to determine if his re-detention was justified, "the probable value of additional procedural safeguards, i.e., a bond hearing, is high." *A.E.*, 2025 WL 1424382, at *5. Although petitioner completed two virtual check-ins late and the government appears to have re-detained him on that basis, Doc. 1 at ¶¶ 9, 15, no neutral arbiter has determined whether the late submission of photos makes petitioner a flight risk such that his re-detention is justified. Respondent argue that petitioner was late on two virtual check-ins, but they do not contest petitioner's evidence that his lateness was due to the fact that he worked the night shift and was asleep at the time the virtual check-ins came in, that he immediately addressed the situation and informed his ISAP officer when he realized he was late on the check-ins, and that given those circumstances the immigration officer informed him that it was fine. Moreover,

---

*Ramirez Clavijo v. Kaiser*, No. 25-CV-06248-BLF, 2025 WL 2419263, at *4–6 (N.D. Cal. Aug. 21, 2025); *Pinchi v. Noem,* No. 25-CV-05632-RMI (RFL), 2025 WL 1853763, at *1 (N.D. Cal. July 4, 2025). The Court does not see a reason to depart from this practice. As the Ninth Circuit has noted, "*Mathews* remains a flexible test" that accounts for the competing interests of an individual detainee and the government. *Rodriguez Diaz*, 53 F.4th at 1206–07.

1   petitioner showed up in person for two check-ins in the following month.

2   Third, although the government has a strong interest in enforcing the immigration laws, the government's interest in detaining petitioner without a hearing is "low." *Ortega v. Bonnar*, 415 F. Supp. 3d 963, 970 (N.D. Cal. 2019); *Doe v. Becerra*, No. 2:25-cv-00647-DJC-DMC, 2025 WL 691664, at *6 (E.D. Cal. March 3, 2025). In immigration court, custody hearings are routine and impose a "minimal" cost. *Doe*, 2025 WL 691664, at *6. "If the government wishes to re-arrest [petitioner] at any point, it has the power to take steps toward doing so; but its interest in doing so without a hearing is low." *Ortega*, 415 F. Supp. 3d at 970.

On balance, the *Mathews* factors show that petitioner is entitled to a bond hearing, which should have been provided before petitioner was detained. "'[T]he root requirement' of the Due Process Clause" is "'that an individual be given an opportunity for a hearing *before* he is deprived of any significant protected interest.'" *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542 (1985) (quoting *Boddie v. Connecticut,* 401 U.S. 371, 379 (1971)); *see Zinermon*, 494 U.S. at 127 ("Applying [the *Mathews*] test, the Court usually has held that the Constitution requires some kind of a hearing *before* the State deprives a person of liberty . . . ."). The Supreme Court has held that Due Process requires a pre-deprivation hearing before those released on parole from a criminal conviction can have their bond finally revoked. *See Morrissey*, 408 U.S. at 480–86. The same is true for those subject to revocation of probation. *Gagnon v. Scarpelli*, 411 U.S. at 782. Numerous district courts have held that these principles extend to the context of immigration detention. *See, e.g.*, *Ramirez Clavijo v. Kaiser*, No. 25-CV-06248-BLF, 2025 WL 2419263, at *4–6 (N.D. Cal. Aug. 21, 2025); *Garcia*, 2025 WL 1927596, at *5; *Pinchi v. Noem,* No. 25-CV-05632-RMI (RFL), 2025 WL 1853763, at *1 (N.D. Cal. July 4, 2025); *Ortega*, 415 F. Supp. 3d at 970; *Doe*, 2025 WL 691664, at *6; *Diaz v. Kaiser*, No. 3:25-cv-05071, 2025 WL 1676854, at *2 (N.D. Cal. June 14, 2025); *Romero v. Kaiser*, No. 22-cv-02508-TSH, 2022 WL 1443250, at *4 (N.D. Cal. May 6, 2022); *Vargas v. Jennings*, No. 20-cv-5785-PJH, 2020 WL 5074312, at *4 (N.D. Cal. Aug. 23, 2020).

With these considerations in mind, petitioner is likely to succeed on the merits.

**b. Petitioner Will Face Irreparable Harm Without Injunctive Relief.**

Turning to the second *Winters* factor, "[i]t is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury." *Hernandez*, 872 F.3d at 994 (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)). "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Warsoldier v. Woodford*, 418 F.3d 989, 1001–02 (9th Cir. 2005) (quoting Wright, Miller, & Kane, Federal Practice and Procedure, § 2948.1 (2d ed. 2004)). Given the Court's conclusion that petitioner is likely to succeed on the merits of his claim that his re-detention without a bond hearing violates the Due Process Clause, petitioner faces irreparable harm absent a temporary restraining order.[9]

**c. Balance of Equities and Public Interest**

When the government is the nonmoving party, "the last two *Winter* factors merge." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (internal citations omitted). Faced with a choice "between [minimally costly procedures] and preventable human suffering," as discussed above, the Court concludes "that the balance of hardships tips decidedly in [petitioner's] favor." *Hernandez*, 872 F.3d at 996 (quoting *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983)).

The public interest also weighs in petitioner's favor. "The public has a strong interest in upholding procedural protections against unlawful detention, and the Ninth Circuit has recognized that the costs to the public of immigration detention are staggering." *Diaz*, 2025 WL 1676854, at *3 (citing *Jorge M.F. v. Wilkinson*, No. 21-CV-01434-JST, 2021 WL 783561, at *3) (N.D. Cal. Mar. 1, 2021); *see also Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 838 (9th Cir. 2020) ("It is always in the public interest to prevent the violation of a party's constitutional rights.") (citing *Padilla*, 953 F.3d at 1147–48).

In conclusion, the Court finds that the requirements for issuing a temporary restraining

---

[9] Respondents cite *Lopez Reyes v. Bonnar*, No 18-cv-07429-SK, 2018 WL 7474861, at *10 (N.D. Cal. Dec. 24, 2018), for the proposition that the harms petitioner faces are "essentially inherent in detention, [and] the Court cannot weigh this strongly in favor of" him. Doc. 12 at 8. *Lopez Reyes* is distinguishable because the court did not find, under the circumstances of that case, that the Due Process Clause required a *new* bond hearing. *Lopez Reyes*, 2018 WL 7474861, at *10.

1  order are met.  Petitioner's immediate release is required to return him to the status quo ante—
2  "the last uncontested status which preceded the pending controversy."  *Pinchi*, 2025 WL
3  1853763, at *3; *Kuzmenko v. Phillips*, No. 2:25-cv-00663-DJC-AC, 2025 WL 779743, at *2
4  (E.D. Cal. Mar. 10, 2025); *see also Valdez v. Joyce*, 25 Civ. 4627, 2025 WL 1707737, at *5
5  (S.D.N.Y. June 18, 2025) (ordering immediate release of unlawfully detained noncitizen); *Ercelik*
6  *v. Hyde*, No. 1:25-CV-11007-AK, 2025 WL 1361543, at *15–16 (D. Mass. May 8, 2025) (same);
7  *Günaydın v. Trump*, No. 25-CV-01151, 2025 WL 1459154, at *10–11 (D. Minn. May 21, 2025)
8  (same).  Respondents are ordered to release petitioner immediately.  Respondents may not re-
9  detain petitioner unless the government proves by clear and convincing evidence at a bond
10 hearing before a neutral decisionmaker that petitioner is a flight risk or danger to the community.

### IV.   Conclusion and Order

Accordingly, petitioner's motion for a preliminary injunction, Doc. 2, is GRANTED.  Respondents are ORDERED to release petitioner immediately.  Respondents are ENJOINED AND RESTRAINED from re-detaining petitioner unless they demonstrate, by clear and convincing evidence at a pre-deprivation bond hearing before a neutral decisionmaker, that petitioner is a flight risk or danger to the community such that his physical custody is legally justified.

The bond requirement of Federal Rule of Civil Procedure 65(c) is waived.  Courts regularly waive security in cases like this one.  *See Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011); *Garcia*, 2025 WL 1676855, at *3; *Pinchi*, 2025 WL 1853763, at *4.

IT IS SO ORDERED.

Dated:   October 16, 2025

UNITED STATES DISTRICT JUDGE